**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**IN ASHLAND**

**CIVIL ACTION NO: 0:22-cv-0018-HRW**

**JAZMINE BRYANT, as Administratrix of the**
**Estate of Derrick J. Bryant, Deceased, et, al.**        **PLAINTIFFS**

**VS**

**JAILER BILL HENSLEY, et, al.**        **DEFENDANTS.**
**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGEMENT**

Comes now the plaintiff by and through the undersigned counsel and hereby submits this response to the defendant's Motion for Summary Judgment and respectfully moves the Court to DENY the Motion as there are genuine issues of material fact in dispute; therefore, the defendants are not entitled to judgment as a matter of law.

## INTRODUCTION

Jazmine Bryant, as Administratrix, brought suit against the Boyd County Detention Center, Jailer William Hensley, and several deputy jailers. Ms. Bryant brought this case to hold the defendants accountable for their failure to protect Mr. Bryant from harm.

## FACTUAL BACKGROUND

On March 3, 2021, Derrick Bryant (Mr. Bryant) was booked into the Boyd County Detention Center (BCDC). Nine days later, Mr. Bryant was dead. On March 12, 2021, Mr. Bryant died by suicide in the cell he had been confined to for the previous nine days. The events that transpired on March 12, 2021, are in genuine dispute. The plaintiff does not dispute that Mr. Bryant was booked into BCDC under the proper protocol and

medically evaluated. Three days later, on March 6, Mr. Bryant showed evidence of what the defendants characterize as a "faked seizure." The on-duty nurse recalls that it was the shift sergeant and not she who stated the belief that "he (Mr. Bryant) is faking it." *See Exhibit One. Scott Depo at 54, 16-24 and at 55,1-8.*

On March 11, deputy jailers took Mr. Bryant to see the medical staff on duty because he told them, "The thoughts won't stop" Defense Exhibit. 2, Medical Progress Notes. On the fateful day of March 12, 2021, Mr. Bryant began exhibiting abnormal behavior, according to defendant Sergeant Timothy Rucker (Sgt Rucker). Sgt. Rucker testified that Mr. Bryant began showing signs of strange behavior. *See Exhibit Two. Rucker Depo at 78, 16-24 and at 79, 1-4 and at 80, 1-3.* Mr. Bryant began to wave his arms, scream and "do something with his head." Sgt Rucker noticed enough strange behavior coming from Mr. Bryant that he ordered deputy jailers under his authority to check on him. The deputy jailers then called Sgt Rucker down to the cell because they could not adequately address Mr. Bryant's issues, according to Sgt. Rucker, he attempted to alleviate Mr. Bryant's inner turmoil by offering to allow Mr. Bryant out of the covid cell and outside for some fresh air. *Id. at 80, 12-22.*

On March 12, 2021, Mr. Bryant had been locked in his cell for nine days due to covid lockdown measures. Mr. Bryant was locked in the smaller "covid cell" on March 3, 2021, and was not due to be let out of the "covid cell" until March 13, 2021. Tragically, Mr. Bryant never made it to March 13, 2021.

After Sgt Rucker himself went to check on Mr. Bryant and took him outside, Mr. Bryant again had an episode of a seizure that the defendants classified as fake (even though they do not possess the requisite medical training to declare a seizure fake or

real.)  Whether it was a medical emergency or not, the defendants should have recognized it as a cry for help from a man who had deteriorated mentally since the day he was booked in BCDC.  Sgt. Rucker asked Mr. Bryant if he wanted to go on (suicide) watch.  Sgt. Rucker testified that he did this unprompted, that no one had said anything to him about placing Mr. Bryant on suicide watch.  *Id. at 89, 6-13.*

Mr. Bryant was a human with natural instincts, desires, and fears like any other human.  Mr. Bryant was locked into a tiny cell for nine days while he deteriorated, and he received no help from those tasked with overseeing him during his confinement within BCDC.  After Mr. Bryant began exhibiting signs of seizure activity, Sgt. Rucker and other deputy jailers took Mr. Bryant to medical, where Nurse Scott evaluated him and told Sgt Rucker that Mr. Bryant needed to go on (suicide) watch.  *See Exhibit One.  Scott Depo at 59, 16-23.*  Nurse Scott testified that when Sgt. Rucker brought Mr. Bryant into medical it was because Mr. Bryant was going on suicide watch.  Nurse Scott said she believed that Sgt. Rucker and the deputies listened to her when she said that Mr. Bryant needed to be on watch.  Nurse Scott said that bringing Mr. Bryant was the first step into putting him on suicide watch and that there was no other reason to take him to medical.  See Exhibit One. *Scott depo at 64, 15- 66, 5.*

Ashley Murphy (formerly Ashley Fritz) worked in the kitchen at the BCDC during the time that Mr. Bryant was detained there.  Ms. Murphy testified during her deposition that Deputy Enyart told her that Mr. Bryant needed to be on suicide watch.   Ms. Murphy also testified that she heard Nurse Scott tell Sgt. Rucker that Mr. Bryant needed to be on suicide watch.

Q. So, who told you that he was acting out?  He was on suicide watch and needed to be on the wrap?

A. Enyart told me that.

Q. He told you all those things?

A. Yes.

Q. Okay.  And so this is while Mr. Bryant is still inside the rec yard?

A. Yes.

Q. And then what happened that you remember?

A. Susan asked him if he was going to hurt himself or anything like that.  I could not hear what he said because he was just mumbling and, you know, whatever, but I heard her ask him if he was going to hurt himself.  He responded.  She asked him again, are you going to hurt yourself?  I don't know what he said.  But he -- she then looked at Rucker and said he needs to go on suicide watch.

Q. Okay.  And so that is inside the rec yard?

A. Yes.

Q. And then where did they take Mr. Bryant to after that?

A. They then took him to medical.

*Murphy Depo at 22, 14- 23, 15.*

Instead of following Nurse Scott's medical advice, Sgt. Rucker asked Mr. Bryant if he wanted to go on (suicide) watch and allowed Mr. Bryant to decline.  Sgt. Rucker testified that Nurse Scott did not tell him that Mr. Bryant needed to go on suicide "watch," yet he decided to ask Mr. Bryant a second time whether he wanted to go on "suicide watch." *See Exhibit Two Rucker Depo at 105, 14-21.*

While Sgt. Rucker did not need Mr. Bryant's permission to put Mr. Bryant on suicide watch, he insisted on asking Mr. Bryant a third time whether Mr. Bryant wanted to go on suicide (which would have given Mr. Bryant even less liberty than the little that he was allowed while in the "covid cell") and abided by Mr. Bryant's stated desire not to be put in the suicide cell.

Sgt. Rucker testified that on a third occasion and again unprompted asked Mr. Bryant if he "wanted" to go on suicide watch, according to Sgt. Rucker, each time he would ask Mr. Bryant if he "wanted" to go on suicide watch, Mr. Bryant would decline the invitation. *Id. at 106, 10-21.*

The defendants were well aware that Mr. Bryant had begun to suffer mentally, yet they did nothing to keep him from the harm they knew was possible. Sgt. Rucker testified that he (Sgt. Rucker) was trying to get into Mr. Bryant's head. *Id. at 107, 13-18.* Nurse Scott further testified that Mr. Bryant would have to have been evaluated by a mental health professional before being released from suicide watch. *See Exhibit One. At 32, 7-18.*

Sgt. Rucker, at this point, was aware that Mr. Bryant was suffering mentally, as evidenced by his sworn testimony that "they were trying to figure out what was going on in his head" Yet Sgt. Rucker (the shift sergeant in charge) did nothing to help Mr. Bryant and instead took him back to the "covid cell," where Mr. Bryant had begun to show signs of his distress. Sgt. Rucker had no medical training, as he admitted in his deposition, yet he made the decision that Mr. Bryant did not need further medical help and took him back to his "covid cell."

Q. Okay. But no medical training?

A. No.

Q. No psychological or mental health

initiative training?

A. No.

*Exhibit Two. Rucker Depo at 13, 4-8.*

Approximately two hours later, Mr. Bryant was found hanging in his "covid cell." *See Exhibit One. Scott Depo at 72, 17-73, 7.*

Sgt. Rucker was aware that Mr. Bryant was a danger to himself. He knew that Mr. Bryant was a candidate for suicide. There is no other reason that Sgt. Rucker would ask three times (by his own admission) if Mr. Bryant wanted to go on (suicide) watch. Nurse Scott stated more than once and in sworn testimony that she told multiple people that Mr. Bryant needed to go on (suicide) watch. Nurse Scott stated that she specifically told Sgt. Rucker that Mr. Bryant needed to go on (suicide) watch. Yet Sgt. Rucker denies not that he did not hear Nurse Scott but that Nurse Scott did not tell him that Mr. Bryant needed to go on (suicide) watch despite it being in Nurse Scott's medical notes. There are colossal genuine issues of material facts in dispute between the testimony of Nurse Scott and Sgt. Rucker that makes a judgment as a matter of law inappropriate as a jury would be the appropriate fact finders in a case of this nature.

## **LEGAL ARGUMENT**

i.        **Judgment as a Matter of Law is Inappropriate**

When comparing summary judgment practice in Kentucky courts under our past decisions, including the holding in <u>Paintsville Hospital</u> Co. v. Rose, Ky., 683 S.W.2d 255 (1985). With the new summary judgment standards announced in the 1986 trilogy of United States Supreme Court cases, we find some similarities and many obvious differences. <u>Steelvest, Inc. v. Scansteel Service Center</u>, Inc., 807 S.W.2d 476, 481–82 (Ky. 1991). First, as to the allocation of burden on the summary judgment motion, in both jurisdictions, the movant has the initial burden of showing that no genuine issue of material fact exists. <u>Id.</u> However, under the new federal standards, this burden does not necessarily require the movant to produce evidence showing the absence of a genuine issue of material fact, but only that he shows that there is an absence of evidence possessed by the respondent to support an essential element of his case. <u>Id.</u> Under the present practice of Kentucky courts, the movant must convince the court, by the evidence of record, of the nonexistence of an issue of material fact. <u>Id.</u>

Secondly, under the federal scheme, the test for summary judgment is the same as that for a directed verdict. <u>Id.</u> In Kentucky, we have clearly held that the consideration to be given to the two motions is not the same and that a ruling on a summary judgment is a more delicate matter, and that its inquiry requires a greater judicial determination and discretion since it takes the case away from the trier of fact before the evidence is actually heard. <u>Id.</u>

Thirdly, under the federal summary judgment standard, the "scintilla" rule applies, and summary judgment will be granted to the movant unless there is evidence on which a jury could reasonably return a verdict in the respondent's favor. Id. Under the Kentucky standard, we conclude that the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy. Id. See Isaacs v. Cox, Ky., 431 S.W.2d 494 (1968). Only when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the Motion for summary judgment be granted. Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476, 481–82 (Ky. 1991).

Finally, under both Kentucky and the federal approach, a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial. Id.

For the reasons previously noted, the new federal standards of summary judgment do have appeal, but we perceive no oppressive or unmanageable case backlog or problems with unmeritorious or frivolous litigation in the state's courts that would require us to adopt a new approach, such as the new federal standards. Id. The standards for summary judgment in Paintsville Hospital, along with other procedural devices (e.g., Civil Rule 11), are sufficient to handle problems concerning unmeritorious litigation and unnecessary trials. Id. We adhere to the principle that summary judgment is to be cautiously applied and should not be used as a substitute for trial. Id. As declared in Paintsville Hospital, it should only be used "to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." Id. It is vital that we not

sever litigants from their right to trial if they do, in fact, have valid issues to try, just for the sake of efficiency and expediency.  Id.

We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id.  In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon Motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id.  In such a situation, there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  Id.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  Id.  "The standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a).  Id.

The first of the recent Supreme Court decisions which changed summary judgment law was Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476–77 (6th Cir. 1989).  Liberty

Lobby was a libel action against the columnist Jack Anderson and certain others working with him…  The defendants had referred to the plaintiff organization and some of its leaders as "Neo–Nazis," anti-Semites, racists, and fascists.  Id.  According to the then-existing First Amendment libel doctrine, plaintiffs, as public figures, could not recover unless they could prove by clear and convincing evidence that Anderson had published calculated falsehoods or had written his article with reckless disregard for the truth.  Id.; see New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).  Id.  After an appropriate time for discovery, the defendants moved for summary judgment on the ground that plaintiffs could not demonstrate that this burden could be met.  Id.

In support of the Motion for summary judgment, the defendants had filed an extensive affidavit by one of their author-investigators detailing his sources.  Id.  In response, the plaintiffs had filed several affidavits asserting that the sources were unreliable and that the publication was untrue and insufficiently supported by an adequate investigation.  Id.  Under precedents then prevailing in most courts, probably including this one, summary judgment would have been denied.  Id.  The record was voluminous and complex, and there were many issues involving the state of mind of the defendants.  Id.  Indeed, the Court of Appeals for the District of Columbia had reversed the trial court's granting of the summary judgment motion.  Id.

Nevertheless, the Supreme Court held that the trial court had properly granted summary judgment.  Id.  It ruled that not every issue of fact or conflicting inference presents a genuine issue of material fact, which requires the denial of a summary judgment motion.  Id.  Further, the Court held that the materiality of any fact should be determined by the substantive law of the case.  Id.  The Court went even further and held

that the test for deciding a motion for summary judgment is the same as that for a directed verdict motion. <u>Id.</u> There is no issue for trial, the Court stated, unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. <u>Id.</u> Thus, the Court concluded, "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u>

Under the standards of both the Federal Rules of Civil Procedure and the common law of the Commonwealth of Kentucky, summary judgment would be inappropriate in this case. This case involves the death of an inmate in custody and care of the BCDC and whether the failure of the staff of the BCDC to prevent the harm that Mr. Bryant was able to inflict on himself could have and should have been prevented if he was placed n suicide watch per Nurse Scotts Orders that were not followed by Sgt. Rucker on three separate occasions.

That is a question that is only appropriate for a jury to decide. It is clear from the testimony of both Sgt. Rucker and Nurse Scott that Mr. Bryant was experiencing severe symptoms of mental anguish. Mr. Bryant's actions on March 6, 2021, March 11, 2021, and March 12, 2021, are enough to show any reasonable person that Mr. Bryant was suffering. Sgt. Rucker admitted that Mr. Bryant was exhibiting strange behavior that belied his mental suffering, Sgt. Rucker went so far as to say that "he tried to figure out what was going on in his (Mr. Bryant's) head. Sgt. Rucker admitted that on three occasions, he (voluntarily) asked Mr. Bryant whether he wanted to go on suicide watch. Mr. Bryant refused each time that the suicide cell was offered.

Nurse Scott testified via deposition that she, on three separate occasions, told multiple jail officials, including Sgt. Rucker, directly that Mr. Bryant needed to go on suicide watch because there was something wrong. Nurse Scott has maintained from day one that she told multiple jail staff that Mr. Bryant needed to be placed on suicide watch, including Deputy Tracie Payne and Sgt. Rucker. Nurse Scott testified that after she told Sgt. Rucker that Mr. Bryant needed to be placed on suicide watch.

The defendants alleged that Nurse Scott did not take any affirmative actions to place Mr. Bryant on suicide watch. Whether that is true or not, that does not alleviate the defendants' duty to Mr. Bryant. The defendants concede in their Motion for Summary Judgment that there is no question that jails have a duty to reasonably address inmate needs. Docket # 48, Page 4, Defendants Motion for Summary Judgment. The defendants go on to say that the deputy jailers are not the guardian angels of inmates and that it is unreasonable to assume that they can predict an inmate's every action. This Court should reject that line of argument as it should not have to consist of an act of Heaven or a Heavenly being for it to be reasonable to recognize that a person is in deep mental anguish when they begin exhibiting the type of behavior that Mr. Bryant exhibited in the days and hours prior to his tragic death, after all, Sgt. Rucker recognized it and three times mentioned suicide watch to Mr. Bryant. If after any of those times, Sgt. Rucker had not waited for Mr. Bryant's permission to be placed in a suicide cell and instead simply used the authority he had to place Mr. Bryant on suicide watch, or followed Nurse Scotts Orders to place Mr. Bryant on suicide watch, three times, then Mr. Bryant would have certainly survived the night of March 12, 2021.

Nurse Scott also recognized that Mr. Bryant needed just a little extra help, just a little extra attention by the BCDC; putting Mr. Bryant on suicide watch would surely not rise to the level of being considered a guardian angel. Nurse Scott and Sgt. Rucker reasonably foresaw the possibility that Mr. Bryant was a danger to himself. There is nothing in the record to reflect that it was a normal occurrence for Nurse Scott to recommend an inmate be placed on suicide watch or for Sgt. Rucker to ask three times for an inmate's permission to put him on suicide watch. There is nothing to suggest that Sgt. Rucker daily goes around to individual inmates and asks if they would like to go on suicide watch. There is likewise nothing to suggest that Nurse Scott had a habit of recommending that inmates go on suicide watch. Mr. Bryant's actions were enough to stir up enough concern about the possibility that Mr. Bryant could be a danger to himself that Nurse Scott and Sgt. Rucker considered that it was foreseeable.

There are genuine issues of material fact to be decided by a jury. A reasonable person could decide that the BCDC staff are liable for their failure to take reasonable actions to prevent harm to Mr. Bryant. The BCDC had policies and procedures in place for the very issue of suicide. Inmate suicides are not so uncommon that it would be so unforeseeable that Mr. Bryant would attempt self-harm. If inmate self-harm is so rare that it would take an act of a guardian angel as the defendants allege, then there would be no reason for a suicide cell in the first place. The question should be left to a jury.

**ii.    The Administratrix has Standing to Sue on Behalf of the Estate of Derrick Bryant.**

The defendants wrongfully allege that Jazmine Bryant (Ms. Bryant) does not have standing to sue on behalf of BJB, who is her half-brother as next friend. However, Ms.

Bryant brought this lawsuit on behalf of Derrick Bryant's estate and not as his daughter, and not on behalf of BJB as his next friend. Defendants correctly note that BJB's next friend would be his mother, (Tanya R. Wheeler) Ms. Wheeler has consented to Ms. Bryant as Administratrix bringing this claim on behalf of Derrick Bryant's estate, and therefore, Ms. Bryant has the requisite standing as Administratrix to bring the lawsuit. Except as restricted or otherwise provided by the will or by *KRS 395.200*, a personal representative, acting reasonably for the benefit of the **interested persons**, may properly… prosecute or defend claims or proceedings in any jurisdiction for the protection of the estate and of the personal representative in the performance of his duties; *KRS 395.195 (19)* (West). Ms. Bryant has clear statutory standing to bring this lawsuit, and BJB is an interested person in this lawsuit.

### iii.    The Defendants Violated Mr. Bryant's Rights Under 42 U.S.C.A. § 1983.

The relevant part of 42 U.S.C.A. § 1983 states every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. *42 U.S.C.A. § 1983* (West). This Court has adopted a three-step analysis in determining when qualified immunity applies. Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900–901 (6th Cir.2004). Gray v. City of Detroit, 399 F.3d 612, 615–16 (6th Cir. 2005).

First, while viewing the facts in the light most favorable to the plaintiff, the Court determines whether a violation of the plaintiff's constitutional rights has occurred.  Id. Second, the Court asks if the violation "involved a clearly established constitutional right of which a reasonable person would have known." Id.  Third, the Court determines if the plaintiff has offered evidence sufficient to show that the official's conduct was objectively unreasonable in light of the clearly established constitutional right at issue.  Id.  A negative answer to any of the three questions means that the officer is entitled to qualified immunity.  Id.

To answer the first question, we must determine what rights a pre-trial detainee possesses with respect to his suicidal behavior.  Id.  While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); Watkins v. City of Battle Creek, 273 F.3d 682, 685–86 (6th Cir.2001).  Gray v. City of Detroit, 399 F.3d 612, 615–16 (6th Cir. 2005).

In order to sustain a § 1983 claim against individuals for failure to provide adequate medical care, a plaintiff must show that the defendants acted with "deliberate indifference to serious medical needs." Id.  Suicide is a difficult event to predict and prevent and often occurs without warning.  Id.  Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on foreseeability.  In Barber v. City of Salem, 953 F.2d 232 (6th Cir. 1992), this Court held that: the proper

inquiry concerning the liability of a City and its employees in both their official and individual capacities under section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.  Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005).

According to the BCDC medical notes, Mr. Bryant told medical staff that "the thoughts won't stop," Mr. Bryant continued to show signs of deterioration days following that trip to the BCDC medical.  Yet, at every occurrence, Mr. Bryant's cries for help were denied.  As has already been established above, the possibility that Mr. Bryant would self-harm was evident to at least two individuals, Nurse Scott and Sgt. Rucker.

The first prong of the test is whether a violation of Mr. Bryant's constitutional rights occurred.  As noted in Gray, a pre-trial detainee has a Constitutional right to adequate health care.  Adequate health care in Mr. Bryant's case was simply placing him on suicide watch. [1] Sgt. Rucker could not be bothered to take that one small reasonable step as Mr. Bryant rolled on the ground in clear mental agony; Sgt. Rucker displayed extreme indifference to his suffering.  Sgt. Rucker did not want to be bothered by Mr. Bryant. *See Exhibit Two.  Rucker Depo at 87,20 - 88, 4.*

---

[1]In Gray, the inmate committed suicide after being placed on suicide watch.  In that case the officers actually took steps to prevent the suicide and yet the inmate still committed suicide. The Officer was held to have immunity.  Here immunity should not apply as Sgt. Rucker nor any other BCDC official even tried to take the step of placing Mr. Bryant on suicide watch.  The defendants in this case would have a stronger argument concerning the guardian angel effort to foresee an inmates suicide if they had taken the reasonable steps  that the officer in Gray, took and actually placed Mr. Bryant on suicide watch.  Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005).

Sgt. Rucker again told Mr. Bryant that he (Sgt. Rucker) was too tired and had had a bad day. *Id. Depo at 88, 5-12.* He did not, or would not follow Nurse Scotts Orders to place Mr. Bryant on suicide Watch on three occasions. This is clearly the failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs that the 6th Circuit held in <u>Gray v. City of Detroit</u>, 399 F.3d 612, 616 (6th Cir. 2005).

Mr. Bryant was in such extreme emotional and mental agony that he was rolling on the ground and exhibiting seizure-like activity, and Sgt. Rucker was more concerned about his own physical well-being. Sgt. Rucker was "too tired" to care whether Mr. Bryant received the adequate medical care he was entitled to under the Due Process Clause of the Fourteenth Amendment. Sgt. Rucker "had a hard day," so Mr. Bryant's health care was not a priority for him; instead of getting Mr. Bryant adequate healthcare, Sgt. Rucker stood by and cussed at him. Even the Boyd County Jailer, William Hensley, stated that it was inappropriate for Sgt. Rucker to do. *Hensley Depo at 35, 4-22.* Not only did Sgt. Rucker foresee that Mr. Bryant was a potential danger to himself, but Sgt. Rucker also displayed a deliberate indifference to Mr. Bryant's health because Sgt. Rucker was "tired" and "had had a hard day." The defendants attempted to shift blame onto Nurse Scott for the failure to place Mr. Bryant on suicide watch, but it was Sgt. Rucker was in charge that day as the shift sergeant.

Sgt. Rucker knew that Mr. Bryant was at risk for suicide yet was too tired to care. Therefore, neither he nor his fellow defendants nor the BCDC can be found to have qualified immunity. The second prong of the test is whether the violation involved a clearly established Constitutional right that a reasonable person would have known. That is

simply answered by stating that even the most unreasonable person would never expect that a person would lose their right to adequate healthcare just because they are in jail. A reasonable person would certainly know, be aware, and understand that in the United States of America, an inmate would be entitled to healthcare. Sgt. Rucker was certainly aware, or he would not have asked Mr. Bryant if he wanted to go on (suicide) watch.

The defendants assert that the plaintiff's lawsuit must fail as a matter of law because the policy and procedures that the BCDC had in place included an initial booking processing that asked whether the inmates had thought about or ever attempted suicide. As the defendants note, "the Sixth Circuit cautions that "very few cases have upheld municipal liability for the suicide of a pre-trial detainee and our cases clearly distinguish between deliberate indifference and negligence." Troutman v. Louisville Metro Dep't of Corr., 979 F.3d 472, 489 (6th Cir. 2020) (citing Gray, 399 F.3d at n.1) (internal quotation marks omitted). Indeed, when a municipality "does create reasonable policies but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability." Gray, 399 F.3d at n.1; see also Molton v. City of Cleveland, 839 F.2d 240, 247 (6th Cir. 1988). In Molton, the Sixth Circuit held a municipality could not be held liable where there was no showing that the municipality's policymakers – as opposed to the individual officers directly involved in the inmate's suicide – ignored a known or apparent risk. Molton, 839 F.3d at 246-47.

Is it reasonable that there is no apparent policy for what to do when an inmate shows no signs of concern during the initial booking process, then later begins showing signs of extreme mental anguish? There were policies and procedures in place to assess whether an inmate was at risk for suicide when they entered the BCDC. However, there

is no policy and procedure that any defendant can point to to show them what the BCDC standard actually was. Sgt. Rucker and Nurse Scott both testified to different things that were supposed to be done to place Mr. Bryant on suicide watch. The case law is clear that if there is a reasonable policy and procedure in place, yet if the defendants were negligent in enforcing that policy and procedure or were negligent in training the deputy jailers, then qualified immunity is proper. However, when there is no "reasonable" policy and procedure in place, then qualified immunity does not apply.

Here, BCDC at the time of Mr. Bryant's suicide did not have any policies and procedures for what happens when an inmate deteriorates mentally while in jail. The policy and procedure that the defendants point to is the intake process. So, the immunity fails because there is no policy and procedure to cover inmate suicide prevention after the initial booking process.

Should the Court look at the policy and procedures that were in place for the initial bookings, then the Court must assess the "reasonableness" of those policies and procedures. The Court must assess whether it is "reasonable" for an inmate to be checked for suicide risk only once during the beginning of that inmate's incarceration. It should not be held to be reasonable that BCDC need only evaluate an inmate's suicide risk once, especially once an inmate begins to show extreme mental anguish, anguish that would prompt a medical professional to state that the inmate should be on suicide watch on three separate occasions. Mr. Bryant showed such mental pain and suffering that not only did Nurse Scott recommend suicide watch, but Sgt. Rucker also (in his own admission, he said without prompt from Nurse Scott) asked Mr. Bryant if he wanted to be on suicide watch, twice.

### iv.     The Defendants are Not Entitled to State Immunity

There is immunity for County officials in some cases, but not every single case and for every single issue.  Yanero holds that an official sued in his or her individual capacity enjoys only qualified official immunity, which affords protection ... for good faith judgment calls made in a legally uncertain environment.  Jefferson County Fiscal Court v. Peerce, 132 S.W.3d 824, 833 (Ky.2004) (quoting Yanero v. Davis, 65 S.W.3d 510 (Ky.2001)).  Rowan Cnty. v. Sloas, 201 S.W.3d 469, 475 (Ky. 2006), as corrected (Sept. 26, 2006).

Thus, officials are not liable for bad guesses in gray areas, Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992), cert. denied, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993), and most government officials are not expected to engage in the kind of legal scholarship normally associated with law professors and academicians… Thus, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.  Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).  Rowan Cnty. v. Sloas, 201 S.W.3d 469, 475 (Ky. 2006), as corrected (Sept. 26, 2006).

Once the officer or employee has shown prima-facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." Yanero v. Davis, 65 S.W.3d 510, 523 (Ky.2001). Rowan Cnty. v. Sloas, 201 S.W.3d 469, 475 (Ky. 2006), as corrected (Sept. 26, 2006).

Good faith, however, is somewhat of a misnomer, as the proof is really of bad faith. In fact, in most cases, good faith is just a presumption that exists absent evidence of bad faith. Rowan Cnty. v. Sloas, 201 S.W.3d 469, 475 (Ky. 2006), as corrected (Sept. 26, 2006). Bad faith can be predicated on a violation of a [causally related] constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position ... or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive. Id.

Under Yanero, public officers and employees are entitled to "qualified official immunity" for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (i.e., were not made in "bad faith"), and (3) were within the scope of the employee's authority. Yanero, 65 S.W.3d at 522. Rowan Cnty. v. Sloas, 201 S.W.3d 469, 475–76 (Ky. 2006), as corrected (Sept. 26, 2006).

Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive, i.e., again, the "bad faith" element. Id. And once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was in bad faith. Id.

The duty that the BCDC and its staff owed to Mr. Bryant has already been established. The issue that concerns Mr. Bryant is whether Sgt. Rucker and the BCDC negligently performed or omitted to perform a ministerial act, or if Sgt. Rucker and/or

the BCDC willfully or maliciously intended to harm Mr. Bryant or acted with a corrupt motive (the "bad faith" element).    First, the plaintiff does not allege that Sgt. Rucker and/or the BCDC willfully or maliciously intended to harm Mr. Bryant.  Second, it is clear and obvious from the facts gathered from Sgt. Rucker's deposition that he indeed acted with a corrupt motive (or "bad faith").  Sgt. Rucker expressed to Mr. Bryant (while Mr. Bryant was on the ground suffering in mental agony) that he (Sgt. Rucker) was having a "hard day" and was "tired" and "wasn't going to do this all day." Sgt. Rucker recognized that Mr. Bryant was suffering but did not take any affirmative action.

On March 12, 2021, when Mr. Bryant began displaying symptoms in his "covid cell," Sgt. Rucker sent other deputies to check on him.  Sgt. Rucker only went to "help" once the deputies told him they needed him after taking Mr. Bryant to the rec yard, Sgt. Rucker demonstrated such contempt and cruelty for Mr. Bryant's basic health needs.  The level of contempt that Sgt. Rucker showed for Mr. Bryant is appalling to the conscious.  The deputies with Sgt. Rucker also witnessed Mr. Bryant's suffering, but they likewise ignored his cries for help during all the instances of Sgt. Rucker's callous treatment of Mr. Bryant's Constitutional rights, his fellow deputy jailers saw and did nothing.  They likewise were charged with abiding by Mr. Bryant's rights, yet every single defendant did nothing to uphold Mr. Bryant's Constitutional rights.  Each named defendant is as liable as Sgt. Rucker.

The defendants point to Reece v. Carey, to argue that the 6th Circuit recently upheld a summary judgment award.  No. 22-5275, 2023 U.S. App. LEXIS 9520, at *17 (6th Cir. Apr. 19, 2023).  The 6th Circuit held that two of the defendants in Reece, were not protected under qualified immunity.  However, as was stated above, the harm that

22

Mr. Bryant suffered (harm by his own hand) was clearly foreseeable as at least two individuals testified under oath that they either suggested suicide watch or offered suicide watch to Mr. Bryant.  So, <u>Reece</u>, does not apply to this case, and can easily be differentiated. Once such person was an actual employee of BCDC and a named defendant in this case, Sgt. Rucker.

**v.  Jailer Hensley is Liable for Mr. Bryant's Ability to Commit Suicide.**

As the defendant notes in their Motion, at a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." <u>Combs v. Wilkinson</u>, 315 F.3d 548, 558 (6th Cir. 2002).  The defendants allege that because Jailer Hensley was not physically present during the altercations with Mr. Bryant, then he could not be liable.  However, it was Jailer Hensley's failure to implement a reasonable policy and procedure that his deputies could have followed, which would have prevented Mr. Bryant's suicide.

As has been discussed already, there is an absence of a policy and procedure covering the issue of an inmate becoming at risk for suicide after the initial booking process.  That failure is Jailer Hensley's failure.  It is on Jailer Hensley that there was no policy and procedure to cover that issue.  Jailer Hensley, by his failure to adequately provide training and information to his deputies, implicitly authorized, approved, and knowingly acquiesced to the Unconstitutional conduct of his deputies.  The Unconstitutional conduct is a violation of Mr. Bryant's right to adequate healthcare under the Due Process Clause of the Fourteenth Amendment.  Jailer Hensley is not liable under vicarious liability, and he is liable for his own official actions.

### vi.    Mr. Bryant Exhibited a Strong Likelihood that He Would Self-Harm.

As has been demonstrated above, Mr. Bryant's actions on March 6, 2021, March 11, 2021, and the day of March 12, 2021, showed that he was a danger to himself. Nurse Scott and Sgt. Rucker thought that Mr. Bryant needed to be on suicide watch.

Sgt. Rucker demonstrated that he knew and suspected that Mr. Bryant was at risk of suicide. Yet he did not place him on suicide watch. There is no other reason for him to ask on three separate occasions whether Mr. Bryant wanted to go on suicide watch. Sgt. Rucker did not ask him any other questions about his mental state; he did not ask him if he wanted to go back into his regular cell.  Instead, Sgt. Rucker testified that he asked three times whether Mr. Rucker wanted to go on suicide watch but did not think Mr. Bryant was at great risk of suicide.  That stretches beyond credulity.  No reasonable person could believe that Sgt. Rucker would ask Mr. Bryant whether he wanted to go on suicide watch without believing that Mr. Bryant was at a high risk of suicide risk.

Mr. Bryant ended up committing suicide less than a mere two hours later.  Sgt. Rucker and the other deputy jailers saw that Mr. Bryant was in turmoil, and Sgt. Rucker brought up suicide watch, but Sgt. Rucker was "too tired" to care whether Mr. Bryant committed suicide.  Sgt. Rucker simply took Mr. Bryant back to his cell to do what he would do, and Sgt. Rucker went on about his "bad day." Mr. Bryant was at a high risk of suicide, and yet not one of the defendants stepped in to stop him.

## **CONCLUSION**

Because there are genuine issues of material fact and because none of the defendants are entitled to immunity, the plaintiff humbly requests that the defendants' Motion for Summary Judgment be DENIED in its entirety.

Respectfully submitted this 16th day of May, 2022.

Very truly yours,

JOY LAW OFFICE

___s/ Sebastian M. Joy_____
Hon. Sebastian M. Joy
Counsel for Plaintiff
Kentucky Bar # 92583
West Virginia Bar # 10945
E-mail: sjoy@joylawoffice.com
Admitted in Kentucky & West Virginia

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**IN ASHLAND**

CIVIL                    ACTION                    NO:0:22-cv-0018-HRW

**JAZMINE BRYANT,** As Administratrix of the
Estate of Derrick J. Bryant, Deceased, **et, al.**                    **PLAINTIFFS**

**VS**

**JAILER BILL HENSLEY, et, al.**                                        **DEFENDANTS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing **RESPONSE TO MOTION FOR SUMMARY JUDGMENT** has been electronically filed with the Clerk of Court this date using the CM/ECF system and served upon opposing counsel as follows:

**VIA CM/ECF:**          Jeffrey C. Mando, Esq.
                         Adams LAW, PLLC
                         40 West Pike Street
                         Covington, KY 41011

                         Attorney for Defendants Jailer Bill Hensley, individually and in his official capacity as Boyd County Jailer, Tim Rucker, individually and in his official capacity as Boyd County Deputy Jailer, Zachary Hunter, individually and in his official capacity as Boyd County Deputy Jailer, Tracie Payne, individually and in his official capacity as Boyd County Deputy Jailer, and Boyd County.

**DATE:**                May 16, 2023

                                        Very truly yours,

                                        JOY LAW OFFICE

                                        ___s/ Sebastian M. Joy_____
                                        Sebastian M. Joy
                                        Counsel for Plaintiff
                                        Kentucky Bar # 92583
                                        West Virginia Bar # 10945
                                        E-mail: sjoy@joylawoffice.com
                                        Admitted in Kentucky & West Virginia