UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| JAZMINE BRYANT, Administratrix of the Estate of Derrick J. Bryant, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 0: 22-018-DCR |
| V. | ) ) ) | |
| JAILER BILL HENSLEY, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case concerns the tragic death of Derrick Bryant which occurred at the Boyd County Detention Center on March 12, 2021. The nurse working that day claims that she advised detention center staff that Bryant should be placed on suicide watch. Notwithstanding this recommendation, correctional staff opted to return Bryant to a standard cell where he ultimately hanged himself. The Administratrix of Bryant's estate brings claims against Boyd County and various correctional staff members for deliberate indifference to Bryant's serious medical needs, failure to train and supervise, negligence, and intentional infliction of emotional distress.

The defendants have filed a motion for summary judgment, which will be granted with respect to the claims asserted against Boyd County, Jailer Bill Hensley, and all defendants in their official capacities. However, there are genuine issues of material fact regarding the plaintiff's claims of deliberate indifference and negligence asserted against Defendants Rucker, Hunter, and Payne in their individual capacities. Additionally, the plaintiff has sufficiently established that Jeff Eiser, her proposed expert witness, is qualified to offer

opinions and testimony in this matter.  As a result, the defendants' motion to exclude his testimony will be denied.

## I. Background

Derrick Bryant was booked into the Boyd County Detention Center ("BCDC") on March 3, 2021.  He was held on charges of violating his probation and failing to appear for a hearing in court.  A routine medical screening form completed the following day indicates that Bryant denied using drugs or alcohol or having any past or present mental health issues, including thoughts of suicide.  [Record No. 48-1]  LPN Latrisha Ferguson noted that Bryant did not exhibit any abnormal mental or physical characteristics suggesting a risk of suicide. Ferguson recommended that he be placed in the general population with no restrictions.  *Id.* However, the jail's policy at that time was to place new inmates in quarantine to reduce to the possible spread of the COVID-19 virus.  [Record No. 58, pp. 40-41]  Bryant was placed in a "COVID-19 isolation cell" (Cell 173) along with another detainee in accordance with this policy.

An unidentified deputy called LPN Susan Scott to Bryant's cell on March 6, 2021.[1] Nurse Scott observed Bryant lying in bed on his right side, exhibiting jerking movements in both upper extremities and blinking his eyes.  Bryant tensed his left arm and began exhibiting seizure-like activity when Scott entered the cell.  The shift sergeant walked in stating, "[h]e's faking it," at which time Bryant sat up and asked, "What?"  [Record No. 48-2]  Scott determined there was no concern of a seizure at that point.  [Record No. 60, p. 56]

---

[1]     Scott was employed by Southern Health Partners which contracted with BCDC to provide medical services to inmates.  [*See* Record No. 60,  p. 28.]

The next documented incident occurred on March 11, 2021, when jail staff brought Bryant to medical when he complained that his "thoughts [would not] stop."  Nurse Amber Cade noted that Bryant "calmed down after talking to staff" and was administered clonidine for elevated blood pressure.  [Record Nos. 48-2; 60, p. 57]

There are varying accounts of what happened on March 12, 2021.  Sergeant Tim Rucker testified that Bryant had "been acting up all day" and wanted out of his cell.  [Record No. 58, p. 86]  Rucker first encountered Bryant around 4:00 p.m. when he received a report that Bryant was "waving at the camera or screaming or something to that effect."  *Id.* at 79-80.  Rucker went to Bryant's cell and observed him sitting on his bed rocking back and forth "doing something weird with his head or something."  Rucker then asked Bryant what was going on and  Bryant responded that he "had to get out of the cell."  Rucker explained to Bryant that this would not be possible until the following day due to the continuing quarantine restriction. Rucker reported that Bryant started to "calm down a little bit," but was "still agitated a little bit."

LPN Scott was nearby in the medical office around this time.  She reports having overheard Bryant yelling and saying that he had received bad news about his mother.  [Record No. 60, p. 85]  Scott contends that she saw jail staff take "the wrap and the chair" toward Bryant's cell.  *Id.* at 61.  Scott explained that the wrap is a device that "kind of holds them down and restrains them if they are acting up and then . . . they can put them in a chair.  And it's almost like a burrito thing that they put them in when they are not being compliant and out of control."  *Id.* at 33.  Scott "grabbed her stuff" because she knew she would have to monitor Bryant's vital signs every 15 minutes while these restraints were in place.  *Id.* at 61.  She did

not recall whether the jail used the wrap for inmates on suicide watch, but she thought "they could if [inmates] are trying to harm themselves."

Rucker testified at his deposition that the wrap is used for inmates who are suspected of being suicidal.  [Record No. 58, pp. 92-93]  However, Rucker did not recall any mention of Bryant having received bad news or anyone saying that Bryant needed to be placed in the wrap. *Id.* at 104.  Instead, he contends that he simply asked Bryant if he would like to go to the rec yard to get some fresh air.  Rucker and Deputy Zachary Hunter then walked Bryant to that location and Rucker returned to the booking area where he attended to other duties.

Deputy Tracie Payne and Nurse Scott walked past the rec yard shortly thereafter and saw that Bryant lying on the ground, rolling from side to side and looking upset.  [Record Nos. 59, p. 17; 60, p. 62]  Nurse Scott told Deputy Payne: "He needs to go on watch."  [Record No. 60, p. 62]  Scott was then called away to see an inmate who was complaining of chest pain. Payne stayed and observed Bryant, who began jerking and displaying what she perceived to be seizure-like activity.  Payne asked Nurse Scott to return to the rec yard and check on Bryant.

Upon noticing that a crowd had begun to form in the rec yard, Rucker also came to see what was happening.[2]  According to Rucker, Nurse Scott stated, "it's Bryant faking a seizure again."  [Record No. 58, p. 82]  Rucker told Bryant: "Come on, Derrick, let's go.  I ain't going to do this shit all day long. . . .  I ain't going to do it."  Nurse Scott maintains that she told Rucker and Hunter that Bryant "should go on watch."  [Record No. 60, p. 63]  Scott explained

---

[2]    Kitchen manager Ashley Murphy was able to see the events from her position near the control room.  According to Murphy, Deputy Enyart stated that Bryant had been placed in the rec yard to calm down or cool off because he was talking about hurting himself.  [Record No. 63-3, p. 20]

that she made this recommendation because she did not "know what was going on with him," his behavior was bizarre, and he was highly anxious. *Id.* at 62.

Rucker, Hunter, and Payne maintain that Scott did *not* tell them that Bryant needed to be placed on suicide watch. Instead, Rucker contends that when Bryant refused to stand up, he *asked* Bryant, "Do you want to go on suicide watch?" Rucker maintains that there had been no mention of suicide watch prior to that moment. Rucker explained that he posed this question to Bryant to "get a rise out of him to see what kind of reaction [he] would get to find out what was going on in his state of mind." *Id.* at 90.

The witnesses agree that Bryant was taken to BCDC's medical office at that point. Rucker and Hunter carried him because he either could or would not walk on his own. Once in the medical office, Bryant sat in a chair and "act[ed] like he was having a seizure again." [Record No. 60, p. 65] Scott instructed Hunter to stop "holding [Bryant] up," so that she could rule out actual seizure activity. Bryant remained in his chair when Hunter stepped away from him and Scott was satisfied that Bryant was not having a seizure. Having ruled out a medical emergency, she stated to "put him on suicide watch" in the presence of Rucker, Hunter, and Payne. *Id.* at 66.

The defendants deny Scott's assertion that she made such a recommendation, or that she made any reference to suicide watch at all. Instead, Rucker contends that Nurse Scott checked Bryant's vital signs and stated that he was "good to go." [Record No. 58, p. 103] Rucker testified that, after Scott cleared Bryant medically, he turned to Bryant and asked for a second time, "Do you want to go on suicide watch?" to which Bryant replied, "No." Rucker explained that he asked the question again "so that the nurse at the time could understand what was going on with him and that he gave us a direct answer." *Id.* at 106. Rucker testified that

he then repeated himself and asked Bryant whether he wanted to go on suicide watch for a third time, to which Bryant responded, "Hell, no." *Id.* Rucker and Hunter agree that Bryant then led them back to Cell 173 at approximately 5:00 p.m.. Hunter subsequently saw Bryant eating dinner and conversing with his cellmate "like nothing was wrong at all." [Record No. 54]

Bryant was discovered hanging from a bedsheet attached to a wall fixture in Cell 173 during a routine check at approximately 6:00 p.m. Jail and medical staff (including Nurse Scott) promptly began CPR, which they continued until EMS arrived and transported Bryant to Kings Daughters Medical Center where he was pronounced dead at 7:21 p.m.

Nurse Scott completed the documentation from her previous encounter with Bryant after EMS left the premises. Her note reads, in relevant part: "jail deputies to return to cell. Advised jail staff Sgt. Rucker to place on suicide watch. Returned to cell." The entry also had the following notation: "4:40p (late entry @ 7:10p)" and was initialed by Scott. [Record No. 48-2] Scott testified that Jailer Bill Hensley reprimanded her for writing the note, stating that jail staff informed him that she had not recommended placing Bryant on suicide watch. Scott only returned to work at BCDC one time following Bryant's death.

The witnesses largely agree on the procedures for placing an inmate on suicide watch. Scott explained that she had the authority to place an inmate on suicide watch. And if she believed an inmate should be placed on watch, she would call a mental health hotline where she would provide information to a higher level practitioner who would then say —"yes, they go on watch and for how long." She would call the hotline again before removing an inmate from suicide watch. [Record No. 60, p. 32] Scott did not know whether the applicable policies

and procedures permitted jail staff to overrule her decision, but she believed that is what happened in Bryant's case. *Id.* 35.

Hensley explained that if jail staff believed that an inmate needed to be on suicide watch, the staff member would take the inmate to medical so that medical staff could follow the procedures described by Scott. [Record No. 56, p. 16] Hensley elaborated that, if a nurse wished to place an inmate on suicide watch, the nurse would do a "suicide form," and "chart it and then notify the staff to have [the inmate] moved."[3] *Id.* at 18. He added that even if medical did not recommend placing an inmate on suicide watch, jail staff could still do so, subject to supervisor approval. *Id.* at 17.

Bryant's daughter, Jazmine Bryant ("Jazmine" or "plaintiff") was appointed Administratrix of Bryant's estate on March 22, 2021. She filed suit on March 12, 2022, alleging that Defendants Bill Hensley, Tim Rucker, Zachary Hunter, Tracie Payne, and Boyd County were deliberately indifferent to Bryant's serious medical needs in violation of the Fourteenth Amendment to the U.S. Constitution. She also alleges that the defendants were negligent, that they committed intentional infliction of emotional distress, and that Boyd County is liable for Bryant's death based on its failure to adequately train its employees.

## II. Motion to Exclude Opinion Testimony

The plaintiff has retained Jeff Eiser to provide opinions and testify as an expert witness in this matter. The defendants have filed a motion to exclude, arguing that Eiser is not qualified to testify as an expert in the administration of mental health services in jails, that his opinions

---

[3]     Scott testified that jail staff would "dress them out, put them in the cell and everything," and *then* medical staff would complete the necessary paperwork and call the hotline. [Record No. 60, p. 135]

are not reliable, that he reaches impermissible legal conclusions, and that his opinions impermissibly invade the province of the jury.

The Court acts as a gatekeeper to evaluate the admissibility of each potential witness's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); *Williams v. Syphan*, 2023 WL 1305084 (6th Cir. Jan. 31, 2023). The primary standard governing the admissibility of expert testimony is Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>     (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) the testimony is based on sufficient facts or data;
>     (c) the testimony is the product of reliable principles and methods; and
>     (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *See also Daubert*, 509 U.S. 579 (identifying additional factors for evaluating scientific testimony); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (extending the *Daubert* analysis to non-scientific testimony). *See also Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001) (observing that the *Daubert* factors are not dispositive and should only apply "where they are reasonable measures of the reliability of expert testimony").

The Advisory Committee on the Federal Rules of Evidence observed that

> [s]ome types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded. . . .
>
> Nothing in [the Rule] is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be

- 8 -

> qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. . . .
>
> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it.". . .  The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. . . .

Fed. R. Evid. 702 advisory committee's note (2000 amendment).

Eiser has extensive experience in the field of corrections.  He holds a bachelor's degree in Criminal Justice from the University of Dayton and a master's degree in Education from Xavier University.  Additionally, Eiser has 29 years of practical experience working in correctional institutions, including 19 years in administration.  He has served as an adjunct professor at the University of Cincinnati since 2002, teaching an undergraduate course in "Introduction to Corrections" and is co-author of the Ohio Jail Administrator's Handbook. Eiser has testified as a jail operations expert in civil rights and tort litigation for both plaintiffs and defendants since 1994, and has testified in 29 cases in the past five years.

The defendants argue that while Eiser may be an expert in general jail facility operations, he is not qualified to testify as an expert with respect to the administration or oversight of mental health services for inmates.  [Record No. 51] However, Eiser's background and qualifications indicate that his expertise lies in all areas of jail facility operations, including prisoner access to medical and mental health care, in-custody deaths, inmate suicide, inmate supervision, inmate initial screening and booking, classification and housing.  *See Silcox v. Hunter*, 2018 WL 3633251, at *10-11 (M.D. Fla. July 31, 2018) (rejecting a similar argument concerning Eiser's qualifications to testify); *DuBois v. Bd. of Cnty. Commr's of Mayes Cnty.*,

2016 WL 907971, at *2 (N.D. Okl. Mar. 9, 2016) (finding that Eiser's extensive qualifications and experience in corrections rendered him qualified to testify regarding the field of jail operations and correctional staffing, policies, procedures, and standards); *see also Little v. City of Morristown, Tenn.*, 2023 WL 2769466 (E.D. Tenn. Mar. 31, 2023) (former jail administrator was qualified to testify regarding the reasonableness of correctional officers' actions based on his experience and background in corrections).

The defendants also contend that Eiser's opinions are not reliable because they are based on common sense rather than professional standards. They argue: "His opinion that jail staff should follow medical professionals' directives as to medical decisions is a decision that anyone can make and does no[t] use the same level of intellectual rigor that would characterize the practice of a jail administration expert."[4]   But expert opinions regarding industry or institutional practices are generally admissible. *See So. Pine Helicopters, Inc. v. Phoenix Aviation Mgrs., Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).   And jail standards, practices and procedures are matters outside the scope of most lay jurors' knowledge and experience. *Peters v. Woodbury Cnty., Iowa*, 979 F. Supp.2d 901, 922 (N.D. Iowa Oct. 25, 2013) (citing *So. Pine Helicopters*, 320 F.3d at 841).   So while an expert may not opine on the ultimate issue of whether a federal law was contravened, he may opine on the relevant institutional practices. *Id.*

---

[4]     Eiser reports: "It is well known in the jail industry that jail security staff must always follow the directions of jail medical staff when it comes to the medical and mental health needs of detainees, including taking reasonable steps to protect a detainee from harm once jail staff receive information the detainee may be at risk. . . ."  [Record No. 51-1, p. 10]  He goes on to state, "Jail staff must never substitute their own judgement for that of the medical professionals when it comes to protecting a detainee from harm and ensuring their access to adequate medical and/or mental health assessment care and treatment."  *Id.*

Finally, the defendants contend that Eiser's opinions should be excluded because in forming them he assumed that Nurse Scott recommended placing Bryant on suicide watch—an assertion the defendants strongly contest.  However, Eiser was free to rely upon Scott's deposition testimony in reaching his conclusions.  "[I]t is the burden of the parties themselves to establish or refute at trial the purported facts experts rely upon to reach their [] opinions, and to the extent the facts are contested, final resolution lies in the hands of the jury.  Assertions of fact not borne out by the proofs will quickly undermine any expert testimony premised on those 'facts.'"  *LidoChem, Inc. v. Stoller Enters. Inc.*, 2013 WL 12224209, at *5 (W.D. Mich. May 7, 2013).

Based on the foregoing analysis, the defendants' motion to exclude Eiser's opinions and testimony will be denied.

### III.  Motion for Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

When a defense of qualified immunity is asserted, the existence of a disputed, material fact does not preclude summary judgment if the defendants cannot be shown to have violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).

## A. BJB as a Plaintiff

Bryant's minor child, BJB, has been named as a plaintiff in this matter. The Complaint describes him as "BJB, a minor, Jazmine Bryant, as next of kin, and as Administratrix of the Estate of Derrick J. Bryant, Deceased." The defendants argue that BJB should be dismissed as a party because Jazmine does not have standing to bring claims on BJB's behalf.

Jazmine's response is somewhat difficult to follow, but she appears to argue that KRS § 395.195 ("Transactions authorized for personal representative") confers standing upon her to bring the suit on BJB's behalf. This section provides, in relevant part:

> Except as restricted or otherwise provided by the will, or by KRS 395.200, a personal representative, acting reasonably for the benefit of the interested persons, may properly . . .
>
> (19) Prosecute or defend claims, or proceedings in any jurisdiction for the protection of the estate and of the personal representative in the performance of his duties . . . .

While § 395.195 provides that a personal representative may prosecute a claim *for the benefit* of an interested party, it says nothing about actually suing in that person's name. Further, actions under 42 U.S.C. § 1983 and K.R.S. § 411.130 must be brought by the personal

representative of the decedent's estate.  *See Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000).  As it stands, it does not appear that BJB would be a proper plaintiff in this matter even if he had reached the age of majority.

Further, Rule 17 of the Federal Rules of Civil Procedure explicitly lists the categories of people who may sue on behalf of a minor.  Jazmine does not purport to fall within the categories of persons authorized under Rule 17.  BJB's claims will be dismissed as being asserted improperly in this proceeding.[5]

### B.  Deliberate Indifference to Bryant's Serious Medical Need

Prisoners have a right to adequate medical treatment.  *Harbin v. City of Detroit*, 147 F. App'x 566, 569 (6th Cir. 2005).  For convicted prisoners, this right arises under the Eighth Amendment's prohibition of cruel and unusual punishment, but for pretrial detainees such as Bryant, the right arises under the Fourteenth Amendment's Due Process Clause.  *Id.*

Title 42 of the United States Code, section 1983, confers a private cause of action for violations of the Constitution or other federal laws.  *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).  To state a claim under § 1983, a plaintiff must allege two elements: (1) a deprivation of a right secured by the Constitution or laws of the United States and that

---

[5]    Kentucky's wrongful death statute, under which the plaintiff's negligence claims arise, creates a new and separate claim for damages sustained by the estate because of Bryant's death. *See* KRS § 411.130.  It includes a provision for distribution of any damages to the decedent's kin. For example, if the decedent leaves a widow and children, the widow receives one-half and the children receive the other half.  If the decedent leaves children and no widow, the children would receive the total award.  *Id.; see also Pete v. Anderson*, 413 S.W.3d 291, 299 (Ky. 2013) (observing that "[t]he personal representative is vested with the responsibility of bringing the action, but the representative is not a statutory beneficiary entitled to recovery").

(2) the deprivation was caused by a person acting under color of state law.  *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

### 1.  Individual Capacity Claims

### a.  Rucker, Hunter, and Payne

A party bringing a claim for deliberate indifference to a serious medical need must show that the pretrial detainee: (1) had a sufficiently serious medical need and (2) that the defendant acted deliberately (not accidentally) and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 316 (6th Cir. 2023) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021)).  The Court "cannot 'impute knowledge from one defendant to another,' rather it must 'evaluate each defendant individually.'" *Greene v. Crawford Cnty., Mich.*, 22 F. 4th 593, 607 (6th Cir. 2022) (cleaned up) (quoting *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

To show that a medical need was sufficiently serious, the plaintiff must demonstrate that conditions of incarceration imposed a "substantial risk of serious harm." *Troutman*, 979 F.3d 472, 482 (6th Cir. 2020).  Psychological needs may constitute serious medical needs particularly where those psychological needs "result in suicidal tendencies."  *Id.* (citing *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  Although there is no general right to "be screened correctly for suicidal tendencies," once a prison official has been "alerted to a prisoner's serious medical needs, including his psychological needs, the official has an obligation to offer medical care." *Schultz v. Sillman*, 148 F. App'x 396, 401 (6th Cir. 2005) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

- 14 -

A plaintiff meets the objective prong of the analysis by showing that the inmate exhibited suicidal tendencies during the period of detention or that he "posed a strong likelihood of another suicide attempt." *Troutman*, 979 F.3d at 482-83. Here, the plaintiffs have identified sufficient evidence to create a genuine issue of material fact regarding this element.[6] Bryant began complaining that his "thoughts wouldn't stop" the day prior to his suicide. He also had expressed extreme distress regarding his confinement in the quarantine cell and displayed aggressive behavior including screaming and kicking his cell door. Bryant had a history of drug abuse and had access to methods for suicide, as evidenced by his ability to hang himself with a bedsheet. *See id.* at 485 (discussing risk factors for suicide). Finally, construing the facts in the light most favorable to the plaintiff, Nurse Scott recommended that Bryant be placed on suicide watch.

The plaintiff has pointed to enough evidence to overcome summary judgment on the subjective element with respect to Defendants Rucker, Hunter, and Payne.[7] The subjective inquiry requires the Court to ask whether the defendant acted deliberately (not accidentally) and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. Accepting Nurse Scott's testimony as true, a jury could infer that jail staff considered using "the wrap and chair" to restrain Bryant shortly after Rucker was

---

[6]     The defendants give short shrift to this issue in their motion for summary judgment, arguing in passing that "neither [Bryant's] 'faked' seizures nor Nurse Susan's alleged suggestion are objectively indicative of a 'strong likelihood' that Bryant would take his life." [Record No. 48, p. 21]

[7]     The defendants suggest for the first time in their reply brief that Hunter and Payne were not deliberately indifferent because they did not have supervisory duties. But arguments raised for the first time in a reply brief are considered waived. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

called to Bryant's cell for the first time on March 12.  It is undisputed that these devices are used to restrain inmates who are out of control and/or suicidal.  Additionally, Scott testified that she overheard Bryant yelling that he had received bad news about his mother around the same time Rucker claims to have been responding to the disturbance at Bryant's cell.

Rucker, Payne, and Hunter were witness to Bryant's erratic behavior, which included rolling on the ground, seizure-like activity (real or feigned), and strange head movements.  Ashley Murphy testified that another deputy advised her that Bryant had been taken to the rec yard to "cool down" because he had been talking about hurting himself.  Most importantly, Nurse Scott claims to have advised Rucker, Payne, and Hunter at multiple junctures that Bryant needed to go on suicide watch.  Considering the totality of the circumstances, a jury could conclude that these defendants acted deliberately and recklessly in the face of an unjustifiably high risk that Bryant would attempt suicide.

The defendants cite the pre-*Brawner* opinion in *Downard v. Martin*, 968 F.3d 594 (6th Cir. 2020), in support of their position.  There, the court noted that "it is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a likelihood of suicide; the test is a *strong likelihood* of suicide."  *Id.* (emphasis in original).  The defendants contend that Bryant did not exhibit a strong likelihood of suicide because no one at the jail—including Nurse Scott—seriously believed that Bryant would harm himself.  [*See* Record No. 60, p. 87.]  However, an unresolved factual issue exists for a variety of reasons.  Nurse Scott testified that she told corrections staff on three occasions that Bryant should go on suicide watch—there is no indication that she told anyone that she did not believe he would actually harm himself.  Further, a jury could believe that Defendant Rucker was

concerned that Bryant had suicidal tendencies because he repeatedly asked Bryant if he wanted or needed to go on suicide watch.

The defendants also rely heavily on Scott's alleged failure to follow the proper procedures for placing an inmate on suicide watch. According to the defendants, Scott should have called a higher level practitioner and completed paperwork. Scott agrees that these steps were part of the process for placing a prisoner on watch. She contends that in the normal course of events, she would make a recommendation to corrections staff to place the inmate on watch and the inmate would then be placed in a secure suicide watch cell. Once the immediate risk had been neutralized, Scott would call a higher level practitioner, complete the paperwork, and finalize the details of the inmate's plan. Construing the testimony in the light most favorable to the plaintiff, a jury could conclude that the defendants rejected Scott's recommendation to place Bryant on suicide watch and she therefore had no reason to continue with the process at that time.

Rucker, Hunter, and Payne are not entitled to qualified immunity. Qualified immunity protects government officials acting in their official capacity from damages based on discretionary acts which do not violate clearly established law of which a reasonable person would have known. *Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir. 2001) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether defendant-officials should be cloaked with qualified immunity requires application of a two-part test. First, the Court asks whether the plaintiff has alleged facts which, taken in the light most favorable to her, show that the defendants' conduct violated a constitutionally protected right. Second, the Court must determine whether that right was clearly established such that a reasonable official would have understood that his or her behavior violated the right. *Id.*

- 17 -

The Sixth Circuit has established the clear right of a prisoner not to have his psychological medical needs, in the form of suicidal tendencies, treated with deliberate indifference.  *Schultz*, 148 F. App'x at 404 (citing *Comstock*, 273 F.3d at 711); *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).  In other words, a detainee is entitled to reasonable protection against taking his own life if the detainee has demonstrated a strong likelihood that he will commit suicide.  *Slone v. Lincoln Cnty., Ky*., 242 F. Supp. 3d 579, 590 (E.D. Ky. 2017) (citing *Bradly v. City of Ferndale*, 148 F. App'x 499, 506 (6th Cir. 2005)).  As previously explained, the plaintiff has identified sufficient evidence from which a jury could conclude that Rucker, Hunter, and Payne were deliberately indifferent to Bryant's suicidal tendencies.

### b.  Hensley

To the extent the plaintiff seeks to hold Jailer Hensley liable in his individual capacity for deliberate indifference to Bryant's serious medical needs, the claim fails because the plaintiff has not alleged that Hensley participated in the events related to the claim.  As the plaintiff concedes, the doctrine of *respondeat superior* does not apply to impute liability to supervisors in § 1983 actions.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, to establish supervisory liability in a § 1983 action, the plaintiff must show that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy*, 729 F.2d at 421.

Further, supervisory liability must be based on more than a mere right to control the employee or a failure to act.  *See Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  The plaintiff's failure-to-train claim is properly characterized as municipal liability claim, not a claim for individual supervisory

liability. *See Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (citing *Phillips v. Roane Cnty., Tenn*., 534 F.3d 531, 543-44 (6th Cir. 2008)). Thus, the deliberate indifference claim against Hensley in his individual capacity will be dismissed.

### 2. Failure to Train and Supervise—Official Capacity Defendants

The plaintiff has sued all of the defendants in their official capacities alleging that the failure to adequately train jail staff led to Bryant's constitutional deprivation and ultimate death. A suit against an officer in his or her official capacity is tantamount to a suit against the municipality itself. *Leach v. Shelby Cnty.*, 891 F.2d 1241, 1245 (6th Cir. 1989); *Todd v. Duvall*, 2019 WL 2353243, at *2 (E.D. Ky. June 3, 2019). However, liability may extend to a governmental entity under § 1983 only when its official custom or policy is the moving force behind a violation of constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015).

The plaintiff argues in response to the defendants' motion for summary judgment that "there is no policy and procedure that any defendant can point to show them what the BCDC standard [for assessing an inmate's suicide risk] actually was." [Record No. 63, p. 19] The absence of a governing policy can be actionable "where the need to act is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need" in failing to institute a policy controlling the situation." *Mills v. Owsley Cnty., Ky.*, 483 F. Supp.

3d 485, 474-75 (E.D. Ky. 2020) (quoting *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)).   A plaintiff can satisfy his or her burden by showing "that the municipality possessed actual knowledge indicating a deficiency with the existing policy . . . (or lack thereof), such as where there have been recurring constitutional violations," or that the need for a policy was 'plainly obvious.'" *Id.*

No reasonable juror could find that such circumstances were present here.   Jailer Hensley testified that BCDC had policies and procedures in place that were loosely based on the Kentucky Administrative Regulations promulgated by the Department of Corrections ("Kentucky Jail Standards").   [Record No. 56, p. 14]   These policies and procedures included suicide prevention measures and deputies received training with respect to warning signs for suicide and self-harm behavior.   [Record Nos. 54, p. 20-21; 58, p. 31-34; 59, pp. 9-11]   Further, there is no evidence to suggest that additional suicides have occurred at BCDC.

Regardless, the plaintiff has not established (or even alleged) that the purported lack of a policy for assessing inmates' suicide risk was the driving force behind the deprivation of Bryant's constitutional rights.   Under the plaintiff's version of the facts, Nurse Scott appropriately identified Bryant's need to be placed on suicide watch and alerted jail staff but, on this isolated occasion, staff did not follow her recommendation.   Accordingly, the claims against Boyd County and the remaining defendants in their official capacities will be dismissed.

### C.  State Law Claims

### 1.  Qualified Immunity

The plaintiff alleges that the defendants also were negligent concerning Bryant's incarceration and death.[8]  The defendants maintain in response that they are entitled to qualified immunity under Kentucky law.  Qualified official immunity shields government officials from civil liability so long as their actions were (1) discretionary; (2) within the course and scope of his or her authority; and (3) made in good faith. *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001).

To overcome the protection afforded by qualified immunity, the plaintiff bears the burden of demonstrating that the defendants acted in bad faith.  *See id*.  The plaintiff may meet this burden by showing that the defendants violated "a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness; *or* [that] the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.*  Where, as here, resolution of the issue is heavily dependent on the same disputed material facts as a constitutional claim under § 1983, the plaintiff will be found to have satisfied her burden.  *See Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (citing *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009)); *Reed v. Campbell Cnty., Ky.*, 2022 WL 3449476 (E.D. Ky. Aug. 17, 2022). As a result, Defendants Rucker, Hunter, and Payne are not entitled to qualified immunity with respect to the plaintiff's claim of negligence.

---

[8]     Boyd County is entitled to sovereign immunity regarding the state law claims and summary judgment will be entered in its favor.  *See Doe v. Patton*, 381 F. Supp. 2d 595, 602 (E.D. Ky. 2005); *Edmonson Cnty. v. French*, 394 S.W. 3d 410, 414 (Ky. Ct. App. 2013).

Defendant Hensley, however, is entitled to qualified immunity.  As noted previously, the plaintiff has not identified any relevant conduct of Hensley aside from his alleged failure to implement a policy for recognizing and/or responding to suicidal inmates.  It is well-settled under Kentucky law that a supervisor's decisions on the content of policies and training is a discretionary function.  *Lawrence for Estate of Hoffman v. Madison Cnty.*, 695 F. App'x 930, 933 (6th Cir. 2017).  And the plaintiff has made no effort to explain why Hensley's alleged conduct (or failure to act) was outside the scope of his authority and/or constitutes bad faith. [*See* Record No. 63, pp. 20-23.]  Accordingly, Hensley is entitled to qualified immunity with respect to the negligence claim.

### 2.  Negligence

To establish a claim of negligence, a plaintiff must show that the defendant owed the plaintiff a duty of care, that the defendant breached the standard by which his or her duty is measured, and that the plaintiff suffered injuries as a result.  *City of Barbourville v. Hoskins*, 655 S.W.3d 137, 140-41 (Ky. 2022).  Under Kentucky law, a jailer has a duty "to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody. . . ."  *Reece v. Carey*, 2023 WL 3003191 (6th Cir. Apr. 19, 2023).  While a jailer cannot be charged with negligence by failing to prevent what he could not reasonably anticipate, the plaintiffs have identified sufficient evidence to create a genuine issue of material fact with respect to this issue.  "[T]he duty of ordinary care to prevent [harm] arises only upon the discovery of some fact which would lead a reasonable person to believe there is some likelihood of ... injury."  *Id.* (citation omitted).  Based on the evidence of Bryant's behavior leading up to his suicide and Scott's alleged recommendation that Bryant should be placed on

suicide watch, a jury could conclude that Rucker, Hunter, and Payne were negligent in failing to take different actions to prevent Bryant's suicide.

### 3. Intentional Infliction of Emotional Distress

Finally, the plaintiff has asserted a claim for intentional infliction of emotional distress ("IIED") against all defendants.  This tort is "intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000).  But Kentucky considers the tort of IIED to be a gap-filler. *Rigazzio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. Ct. App. 1993).  At bottom, IIED is not a valid cause of action where the alleged conduct makes out a claim for another tort for which emotional damages are available.  *Id.*; *see also Banks v. Fritsch*, 39 S.W.3d 474 (Ky. Ct. App. 2001).  The Kentucky Supreme Court has recognized that a plaintiff generally may not maintain both a negligence and an IIED claim based on a single set of facts. *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012).  The sole exception is where the alleged actions or conduct are intended only to cause extreme emotional distress in the victim.  *Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 1999).

Regardless, the facts as alleged by the plaintiff do not rise to a level sufficient to be considered outrageous conduct to support an IIED claim.  *See, e.g., Benningfield v. Pettit Envir., Inc.*, 183 S.W.3d 567, 57 (Ky. Ct. App. 2005) (observing that wrongful termination, even if based on discrimination, does not rise to the level of extreme and outrageous conduct). Further, the plaintiff has not pointed to any evidence suggesting that the defendants' alleged actions were intended solely to cause Bryant extreme emotional distress.  Accordingly, the IIED claim will be dismissed.

## IV.  Conclusion

Based on the foregoing, it is hereby **ORDERED** as follows:

1.      The defendants' motion for summary judgment [Record No. 48] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order.

2.      The defendants' motion to strike the opinions and testimony of Jeff Eiser [Record No. 51] is **DENIED**.

3.      The Clerk of the Court is directed to terminate the following parties: Plaintiff BJB; Defendant Bill Hensley, Individually; Unknown Employees of the Boyd County Detention Center, Individually and in their Official Capacities as Boyd County Deputy Jailers; Boyd County, Kentucky; Jailer Bill Hensley in his Official Capacity as Boyd County Jailer; Tim Rucker in his Official Capacity as Boyd County Deputy Jailer; Zachary Hunter in his Official Capacity as Boyd County Deputy Jailer; and Tracie Payne in her Official Capacity as Boyd County Deputy Jailer.

Dated:  May 31, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky